UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

TERRANCE ALTON COX III and
DIVERSITY MOTORSPORTS RACING, LLC,                    Civil Action No. _____

                                        Plaintiffs,

                                                                **COMPLAINT**

             against-
                                                                 PLAINTIFF
NATIONAL ASSOCIATION FOR STOCK CAR RACING, INC.,                 DEMANDS A
INTERNATIONAL SPEEDWAY CORPORATION, RICHARD                      TRIAL BY JURY
PETTY MOTORSPORTS, RICHARD CHILDRESS RACING,
TEAM PENSKE, HENDRICK MOTORSPORTS, ROUSH FENWAY
RACING, CHIP GANASSI RACING, JOE GIBBS RACING, STEWART
HASS RACING, FURNITURE ROW RACING, FRONT ROW
MOTORSPORTS, JTG DAUGHERTY RACING, TOMMY BALDWIN
RACING, GERMAIN RACING, GO FAS RACING, BK RACING, PREMIUM
MOTORSPORTS, CIRCLE SPORT RACING, and HSCOTT MOTORSPORTS,

                                        Defendants.

        Plaintiffs, **TERRANCE ALTON COX III** and **DIVERSITY MOTORSPORTS RACING,**

**LLC**, by their attorney, Ronald I. Paltrowitz, Esq., for their "Complaint" against the

Defendant herein, respectfully allege, upon information and belief, as follows:

                                **THE PARTIES**

        1.      Plaintiff, **TERRANCE ALTON COX III** ("Cox"), is an individual residing at

1506 Augusta Drive, Marietta, Georgia.

        2.      Plaintiff, **DIVERSITY MOTORSPORTS RACING, LLC** ("Diversity

Motorsports"), is a North Carolina limited liability company with a principal place of

business at 709 Performance Drive, Mooresville, North Carolina.

3.      Cox, is the chief executive officer of Diversity Motorsports.

4.      Defendant, the **NATIONAL ASSOCIATION FOR STOCK CAR RACING, INC.** ("NASCAR"), is a closely owned Florida corporation with a principal place of business at 1801 West International Speed Boulevard, Daytona Beach, Florida and an office for the conduct of business at 65 East 55th Street, New York, New York.

5.      The current CEO of NASCAR is Brian France.

6.      Defendants, RICHARD PETTY MOTORSPORTS, RICHARD CHILDRESS RACING, TEAM PENSKE, HENDRICK MOTORSPORTS, ROUSH FENWAY RACING, CHIP GANASSI RACING, JOE GIBBS RACING, STEWART HASS RACING, FURNITURE ROW RACING, FRONT ROW MOTORSPORTS, JTG DAUGHERTY RACING, TOMMY BALDWIN RACING, GERMAIN RACING, GO FAS RACING, BK RACING, PREMIUM MOTORSPORTS, CIRCLE SPORT RACING, and HSCOTT MOTORSPORTS (hereinafter collectively referred to as the "Charter Defendants"), are each a party to an agreement with NASCAR (the "Charter Agreement').

7.      Defendant, INTERNATIONAL SPEEDWAY CORPORATION ("ISC") is a Florida corporation with a principal address at 1 Daytona Boulevard, Daytona Beach, Florida, whose publicly traded shares are listed on the NASDAQ and OTCQB exchanges.

8.      ISC is managed by James France, Chairman of the Board, and Lesa France Kennedy, Chief Executive Officer.

9.      Brian France, James France, and Lesa France Kennedy are all descendants of Bill France, Sr., the founder of NASCAR and ISC, and Bill France, Jr. (Brian France, James France, and Lesa France Kennedy are hereinafter collectively referred to as the "France Family".)

10.     NASCAR and ISC are controlled by, and alter egos for, the France Family.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of, and the parties to, this action pursuant to 42 U.S.C.A. 1981a, and 28 U.S.C.A. §1331 (b).

12.     Venue is proper in the Southern District of New York County of New York pursuant to 28 U.S.C.A. §1391 (b) (3).

## PUNITIVE DAMAGES

13.     Plaintiffs are entitled to recover punitive damages pursuant to the provisions of 42 U.S.C.A, 1981a (b).

## JURY TRIAL

14.     Plaintiffs are entitled to a jury trial pursuant to the provisions of 42 U.S.C. 1981a(c).

## FACTS

15.     NASCAR was founded by Bill France, Sr. in 1948.

16.     In the United States, NASCAR is the largest sanctioning body for motorcar racing, one of the most viewed professional sports, earns the second-highest ratings of any regular-season sport on television, broadcasts in over 150 countries, caters to 75 million fans, and sells over $2 billion in licensed merchandise annually.

17.     NASCAR sanctions approximately 1,500 races at over 100 tracks throughout the United States, Canada and Mexico and has exhibition races in Australia and Japan.

18.     NASCAR's annual revenue in 2015 was approximately $700 million.

19.     None of the NASCAR senior management team is African American[1].

20.     In or about February 2016, the Charter Defendants entered into a nine (9) year Charter Agreement with NASCAR.

---

[1] Plaintiffs acknowledge that there are a small number of African Americans among NASCAR's employees.

21.    The Charter Agreement provides, *inter alia*, that each of the Charter Defendants is guaranteed entry into the field of every Sprint Cup Series points race[2].

22.    The Charter Agreement also provided for the creation of a Team Owners Council, which will work closely with NASCAR on long-term governance issues and for the sharing of revenues.

23.    ISC was founded by Bill France, Sr. in 1953.

24.    ISC "owns and/or operates 13 of the nation's premier motorsports entertainment facilities . . . promotes more than 100 motorsport events . . . [and] owns and operates Motor Racing Network, the nation's largest independent sport radio network and Americrown Service Corporation, a provider of catering services, food and beverage concessions, and merchandise sales." [3]

25.    The Daytona 500 is one of ISC's premier race promotions.

26.    No African-American driver has ever participated in the Daytona 500.

27.    From its founding in 1948 until the date of the Complaint, only three (3) African American Drivers have raced in NASCAR top tier events.

28.    In 1963, Wendell Scott was the first African American race car driver to win a race in NASCAR's top-tier racing division, winning the Jacksonville 200.

29.    No African-American driver, other than Wendell Scott has won a NASCAR sanctioned event in more than 50 years.

30.    Only two other African-American drivers have even competed in a top-tier NASCAR race: Willy T. Ribbs (three races in the 1980s) and Bill Lester (two races in 2006.).

31.    NASCAR listed 48 Sprint Series drivers on the 2016 list of drivers on its website (www.nascar.com) (the "NASCAR Website"), none of whom is African American.

---

[2] Upon information and belief, the NASCAR Sprint Cup Series is the top racing series of the National Association for Stock Car Auto Racing, Inc.

[3] The quoted information was contained on the ISC internet website, www.international speedwaycorporation.com on the date this Complaint was prepared.

32. NASCAR listed 48 Xfinity Series[4] drivers on the 2016 list of drivers on the NASCAR Website, only one of whom is African American.

33. None of the Charter Teams listed on the NASCAR Website is owned or partially owned by either an African American individual or an African American owned corporation or LLC other than a ten percent 10% ownership of JTG Daugherty Racing by an African American, Brad Daugherty.

34. In or about 2015, the Obaika Racing Team, owned by a black Nigerian citizen, began to race in the NASCAR Xfinity Series.

35. None of the drivers racing for the Obaika Racing Team is African American.

36. The 2010 US Census indicates that 14% of the US population is either black alone (13%) or black in combination with one or more other races (1%).

37. African-Americans comprise an even greater percentage of the population in the southern states where NASCAR is most popular.

38. Zero percent (0%) of the 2016 NASCAR Sprint Cup drivers listed on the NASCAR Website are black alone or black in combination with one or more other races.

39. Zero percent (0%) of the 2016 NASCAR Xfinity Series drivers listed on the NASCAR Website are black alone.

40. Zero point zero two percent (0.02%) of the 2016 Xfinity Series drivers listed on the NASCAR website (one driver) are black in combination with one or more other races.

41. In 2016, NASCAR's top 13 drivers, all of whom are Caucasian, each earned more than $10 million.

---

[4] The NASCAR Xfinity Series is promoted as NASCAR's minor league circuit.

42.     None of NASCAR's corporate sponsors currently sponsor an African-American racing team.

43.     Neither NASCAR nor the Charter Defendants or ISC has made any efforts to have any of its corporate sponsors sponsor an African-American racing team.

44.     The lack of corporate sponsorship is an almost insurmountable obstacle to the integration of NASCAR, the Charter Defendants, and ISC.

45.     In or about February 2009, Cox approached a majority of the Charter Defendants outlining his plan for diversity initiatives that would enhance each team's presence in the African-American community.

46.     None of the Charter Defendants has subsequently hired an African American Sprint Series driver.

47.     In or about March 2009, Cox contacted NASCAR and informed it of his interest in learning more about the "Drive for Diversity" program and his interest in implementing diversity initiatives within NASCAR.

48.     Cox was directed to NASCAR's Vice President of Public Affairs and Multicultural Development, Marcus Jadotte ("Jadotte"), and Director of Multicultural Development Dawn Harris ("Harris").

49.     Thereafter, in late March 2009, after numerous attempts to schedule a meeting, Cox was able to meet with Jadotte and Harris.

50.     After Cox presented his business plan to Jadotte, he was advised by Jadotte that he start at the Go-Kart level and work his way up to the big cars and top racing levels, after which NASCAR would agree to work with him.

51.     Thereafter, in or about April 2009, Cox met with Don Towne ("Towne"), the owner of the Pit Indoor Kart Racing, the largest indoor Go-Kart racing facility in the country.

52.      After explaining his business plan, Towne hired Cox as Director of Marketing for his facility.

53.     During the course of his affiliation with The Pit Indoor Kart Racing, Cox was able to successfully engage the minority community and increase and diversify the sport's audience and participants.

54.     In or about May 2009, Cox launched the "One Race, One World" diversity initiative through The Pit Indoor Kart Racing in collaboration with the Buck Baker Driving School and Comedian Larry Veal of "BeMORE Positive."

55.     The program, which debuted at Oprah Winfrey's Boys & Girls Club in Jackson, Mississippi, was designed to increase minority interest in and engagement with NASCAR and nurture minority talent for future employment in the motorsports industry.

56.     In or about November 2010, Cox was approached by race driver Ricky Byers, a Caucasian, and asked if Plaintiff would be willing to secure additional funding for his "Racing for A Cure" program at the Automobile Racing Club of America ("ARCA.").

57.     ARCA is a major stock car racing sanctioning body that competes on the same tracks as NASCAR.

58.     In or about November 2010, Cox was able to increase stock car racer Ricky Byers' sponsorship by raising approximately $35,000 and adding the largest African American Pentecostal faith organization, The Church of God in Christ, as a sponsor.

59.     Cox also gained experience by working directly with Ricky Byers' racing team at various ARCA stock car races.

60.     In or about Fall 2010, as a result of his success with Go-Kart racing and ARCA racing level, Cox was ready to ascend to the Nationwide Series, which, at the time, was NASCAR's second-tier racing series.

61.     Toward that end, Cox partnered with Bob Schacht, a 42-year veteran of motorsports who had fielded racing teams in ARCA and NASCAR, and formed their company, Diversity Motorsports Racing LLC.

62.     Diversity Motorsports was organized to market and promote African-American racecar drivers and African-American racing teams in order to enable the African-American drivers and racing teams the same opportunities and revenues that their white counterparts enjoy from their association with NASCAR.

63.     From in or about 2009 until the date of the Complaint, Cox and Diversity Motorsports have attempted to work with NASCAR to establish genuine racial diversity at NASCAR by working with NASCAR to recruit African American drivers and by creating new African American racing teams.

64.     NASCAR has continuously refused to work with Cox or Diversity Motorsports alleging that NASCAR has its own diversity program, "Drive for Diversity", which it created in 2004.

65.     In addition, NASCAR has intentionally interfered with the efforts of Cox and Diversity Motorsports to integrate the US motorsports industry by perpetuating, condoning, and actively participating in actions designed to humiliate, degrade, ostracize and exclude Cox.

66.     From in and after 2004 until the date of the Complaint, NASCAR's alleged Drive for Diversity program has recruited one driver for its Xfinity Series who is black in combination with one or more other races and no African American drivers for its Sprint Car Series.

67.    In or about July 2011, Diversity Motorsports' first race car (#19 Racing 4 Education owned by Tristar Motorsports and driven by Mike Bliss competed in the Subway Firecracker 250, a then Nationwide Series event race, at Daytona International Speedway in Daytona Beach, Florida.

68.    At a press conference during the Subway Firecracker 250 Cox announced Diversity Motorsports' intent to bridge the gap between NASCAR's "Drive for Diversity" program and true racial integration in the US motorsports industry.

69.    Following the press conference at Daytona International Speedway NASCAR's Vice Chairman Mike Helton discussed Plaintiff's business plan with him, and encouraged Plaintiff to speak to African-American Max Siegel, owner of Rev Racing and business development strategist for "Drive for Diversity."

70.    From in or about July 2011 through January 2012, Cox repeatedly called Mr. Siegel but the calls were not returned.

71.    As a result of the foregoing, Cox and Diversity Motorsports were intentionally and wrongfully denied the opportunity to participate in the Drive for Diversity program.

72.    In or about July 2011, Cox and Diversity Motorsports launched the "Racing 4 Education" program, which was designed to sponsor and launch the future careers of African American racing team owners and African American drivers, and to educate minority youth.

73.    Concurrently with the launch of Racing 4 Education, Cox, accompanied by Diversity Motorsports CFO, Adrian Sinden and Account Representative   David Shanks, and Dr. Evelyn Bethune, CEO of the Mary McLeod Bethune Legacy Preservation Institute, met

for a second time with Jadotte and Harris at NASCAR's corporate headquarters in Daytona Beach, Florida.

74.     During the course of this meeting, Cox discussed Diversity Motorsports' progress and success, and advised Jadotte and Harris that Diversity Motorsports was ready to go to the next level.

75.     Cox did not seek monetary support but simply asked that NASCAR publicly support their Racing 4 Education Motorsport brand.

76.     At the conclusion of the meeting Jadotte indicated that NASCAR would do what was needed to find sponsors for the Racing 4 Education program."

77.     NASCAR has never attempted to find sponsors for Racing 4 Education.

78.     As a result of the foregoing, Cox and Diversity Motorsports were intentionally and wrongfully prevented from obtaining sponsorship for its programs.

79.     From in or about July 2011 through December 2015, Cox and Diversity Motorsports attempted to promote the career of a young African-American driver, Matt Murphy.

80.     NASCAR refused to assist Cox and Diversity Motorsports and, as a result, Cox and Diversity Motorsports was unable to generate the necessary corporate sponsorship.

81.     From in or about July 2011 through approximately 2015, a Diversity Motorsports car and driver, in association with Bob Schacht Motorsport, competed in between 8 and 12 races annually in the ARCA racing series.

82.     In or about Fall 2011, Cox and Diversity Motorsports launched a "Racing for Alzheimer's Awareness" program in cooperation with The National Alzheimer Association, and retained Bern Nadette Stanis as Spokesperson.[5]

---

[5] Bern Nadette Stanis is an African-American actress best known for portraying "Thelma" in the hit television series "Good Times".

83.     Staples, RBC Bank, and the William Morris Agency offered informal commitments of sponsorship (the "Proposed Sponsors").

84.     Thereafter, when the Proposed Sponsors approached NASCAR regarding their potential sponsorship of Plaintiffs' "Racing for Alzheimer's Awareness" program, NASCAR intentionally and wrongfully discouraged the Proposed Sponsors from supporting the program.

85.     As a result of NASCAR's actions, the Racing for Alzheimer's Awareness program was disbanded.

86.     In or about October 2011, Cox met with Jadotte a third time at NASCAR headquarters in Daytona Beach, Florida.

87.     During the course of this meeting, Cox not only discussed the progress, being made by Diversity Motorsports but also informed Jadotte that Diversity Motorsports had invested approximately $3.7 million creating a racing team.

88.     In or about December 2011, Diversity Motorsports sponsored African American driver Matt Murphy, in his first race at Ace Speedway in Altamahaw, North Carolina, came from behind to win his stock car race.

89.     In or about January 2012, Matt Murphy, finished in second place at Dillon Speedway in South Carolina.

90.     Despite this proof of Diversity Motorsports competence, NASCAR continued to refuse to assist Diversity Motorsports in obtaining corporate sponsors for Mr. Murphy.

91.     In 2012, Cox developed the "Reach1Teach1" program designed to encourage minorities to participate in NASCAR.

92.     NASCAR refused to engage with Cox and Diversity Motorsports regarding this program.

93.     In the Summer of 2012, during a Jesse Jackson diversity event in Chicago, Harris admitted to African-American race driver Bobby Norfleet that "NASCAR had stopped spending time trying to engage with the African American community and was now focusing on Hispanics."

94.     During the course of 2012 and 2013, Cox spoke to NASCAR twice concerning Reach1Teach1.

95.     While NASCAR initially expressed interest, it refused to promote or encourage sponsorship of Reach1Teach1.

96.     In or about July 2013, Diversity Motorsports. was in the process of finalizing a $3.7 million agreement with former NFL player Clark Haggans ("Haggans")[6], an African-American, for Haggans to own a NASCAR racing team.

97.     Cox inquired of Charter Defendant Roush Fenway Racing ("Roush") to determine if Roush would work alongside Diversity Motorsports with Haggans.

98.     Roush advised Diversity Motorsports that it had no interest in working with Diversity Motors.

99.     In or about April 2013, Haggans' agent informed Cox that NASCAR had dissuaded them from signing an agreement with Diversity Motorsports and encouraged Haggans to associate with former NASCAR drivers Dale Earnhardt or Tony Stewart, both Caucasians, instead.

100.    As a consequence of NASCAR's interference, Haggans refused to sign with Diversity Motorsports.

101.    In or about March 2014, Michael Griffin, Director of Workforce Development for The National Guard Youth Foundation ("NGYF"), a non-profit organization that provides

---

[6] Haggans played in the NFL for the Pittsburg Steelers, Arizona Cardinals, and San Francisco 49'ers from 2000 through 2012.

scholarships, training and assistance to underprivileged youth, approached Cox and Diversity Motorsports and expressed an interest in having Cox create a NASCAR racing program for the underprivileged youth NGYF was assisting.

102.    In or about September 2014, Cox created a "Race for the Challenge (R4TC)" program for NGYF.

103.    Cox and Diversity Motorsports estimated the value of an agreement with NGYF at $26 million.

104.    Thereafter, Cox was informed that a NGYF Board member had contacted NASCAR and was told "it would not be viewed favorably by NASCAR" for NGYF to work with Cox and Diversity Motorsports.

105.    As a result of the foregoing, Cox and Diversity Motorsports were intentionally and wrongfully prevented from completing an agreement with NGYF.

106.    In or about March or April 2015, Cox again spoke to NASCAR concerning "Reach1Teach1."

107.    Thereafter, Cox spoke with numerous NASCAR executives regarding the Reach 1 Teach 1 program including Senior Vice President of Business Development Eric Nyquist, a Caucasian, Senior Director of Growth Segment Marketing Pete Jung, an Asian, Director of Green Initiative Catherine Kummer, a Caucasian, Vice President of Green Innovation Michael Lynch, a Caucasian, and Business Development Group Administrative Assistant Diana Milner, a Caucasian,

108.    On or about May 19, 2015, NASCAR's Legal Department sent Cox and Diversity Motorsports a letter declining their offer regarding Reach 1 Teach 1, and directing Cox and Diversity Motorsports to cease all future communications with NASCAR,

and informing them that all prior communications had been deleted from NASCAR's records.

109.    In or about September 2015, Cox and Diversity Motorsports were approached by Steve Harvey ("Harvey"), who proposed a racing team to be called "Steve Harvey Races 4 Education."

110.    Thereafter, Harvey approached NASCAR to propose the creation of Steve Harvey Races 4 Education in association with Cox and Diversity Motorsports.

111.    NASCAR advised Harvey that it would not sanction any race team associated with Cox and Diversity Motorsports.

112.    As a result of the foregoing, Cox and Diversity Motorsports were wrongfully denied the opportunity to create a Steve Harvey Races 4 Education racing team.

113.    Thereafter, on or about June 29, 2015, NASCAR's in-house Corporate Counsel Zachary Daniel requested that Cox and Diversity Motorsports refrain from any future correspondence with NASCAR.

114.    All racing events scheduled in NASCAR series races must be sanctioned by NASCAR,

115.    All events scheduled at ISC tracks must be sanctioned by ISC.

116.    NASCAR has acknowledged that there is discrimination in motorsports racing in the United States by joining an initiative with Ross Initiative in Sports ("RISE").

117.    he RISE initiative is a public relations announcement indicating that NASCAR sanctioned drivers do not support discrimination.[7]

118.    On May 19, 2012, the New York Times published an article that stated that Wendell Scott was the only [African-American] driver to win a NASCAR sanctioned race in 64 years and that only one (1) African-American driver had won a NASCAR sanctioned race since 1986.

119.    The New York Times article also stated that ". . . every American sport has black stars. NASCAR has none."[8]

120.    NASCAR has engaged in unlawful intentional racial discrimination by refusing to sanction African American owned racing teams for its various Cup Series.

121.    The Charter Defendants have engaged in unlawful intentional racial discrimination by refusing to hire African American Drivers for its racing teams.

122.    ISC has engaged in unlawful intentional racial discrimination by cooperating with NASCAR and the Charter Defendants in preventing African American racing teams and drivers from appearing in motorsports events at tracks owned by ISC.

123.    At all relevant times, NASCAR and ISC knew, or should have known, that they were sanctioning events held at ISC arenas (among others) and sanctioning the racing teams that participate in these events, which events were intentionally racially discriminatory.

124.    As a result of the foregoing, NASCAR and ISC have been complicit in, and supportive of, the racially discriminatory environment that virtually excludes African-Americans from meaningful participation in motorsports racing in the United States.

---

[7] Tom Jensen, Fox Sports, June 11, 2016
[8] New York Times, May 19, 2012

125.    In 2016, motorsports remain the most racially segregated sport in the United States.

126.    The intentional racial discrimination by NASCAR, the Charter Defendants, and ISC has been intentionally orchestrated by the France Family and the management of ISC.

## AS AND FOR A FIRST CAUSE OF ACTION
## §1981- RACE DISCRIMINATION (COX)

120.    Cox and Diversity Motorsports repeat and realleges each and every allegation contained in paragraphs 1 through 126 inclusive, with the same force and effect as though more fully set forth at length herein.

121.    Because he is African-American, NASCAR, the Charter Defendants, and ISC have denied Cox the same rights to make and enforce contracts enjoyed by Caucasian citizens employed by and/or associated with NASCAR, the Charter Defendants, and ISC, including rights involving the making, performance, modification, and termination of employment and marketing contracts with NASCAR, the Charter Defendants, and ISC, as well as the enjoyment of all benefits, privileges, terms and conditions of such relationships, in violation of 42 U.S.C. §1981.

122.    Because he is African American, Cox has been deprived of the right to be employed by NASCAR, the Charter Defendants, and ISC and has further been deprived of the right to contract with Defendant NASCAR.

123.    Because he is African American, Cox has been subjected to virulently hostile and discriminatory treatment that any reasonable person would find offensive.

124.    As a consequence of NASCAR, the Charter Defendants, and ISC's intentional and wrongful conduct, Cox has incurred physical and psychological trauma and injury, has suffered great humiliation, loss of esteem, mental anguish, distress, shock, fright and

suffering, has incurred significant economic loss, and has sustained lasting and permanent damage.

125.    In the employment and contracting practices described above, NASCAR, the Charter Defendants, and ISC intentionally engaged in discriminatory practices with malice or with reckless indifference to Cox's federally protected rights thereby entitling Plaintiff to punitive damages.

126.    As a result of the actions of NASCAR, the Corporate Defendants, and ISC, Cox was prevented from recognizing the profits earned by motorsports racing teams from driver earnings, sponsorship, NASCAR's points-based pro-rata share of TV revenues, gate revenues and merchandising.

127.    Accordingly, Cox is entitled to Seventy-Five Million Dollars ($75,000,000.00) in compensatory and Four Hundred Twenty-Five Million Dollars ($425,000,000.00) in punitive damages, as well as equitable relief, plus the costs and disbursements of this action including reasonable attorneys' fees.

## AS AND FOR A SECOND CAUSE OF ACTION
## §1981- RACE DISCRIMINATION (DIVERSITY MOTORSPORTS)

128.    Cox and Diversity Motorsports repeat and realleges each and every allegation contained in paragraphs 1 through 126 inclusive, with the same force and effect as though more fully set forth at length herein.

129.    Because Diversity Motorsports is an African-American owned business, NASCAR, the Charter Defendants, and ISC have denied Diversity Motorsports the same rights to make and enforce contracts enjoyed by White-owned businesses contracting with and/or associated with Defendant, including rights involving the making, performance, modification, and termination of employment and marketing contracts with Defendant, as

well as the enjoyment of all benefits, privileges, terms and conditions of such relationships, in violation of 42 U.S.C. §1981.

130.    Because Diversity Motorsports is an African-American owned business, NASCAR, the Charter Defendants, and ISC have refused to contract with Diversity Motorsports, deprived Diversity Motorsports of the right to contract with NASCAR, the Charter Defendants, and ISC have, and has further subjected the company to virulently hostile and discriminatory treatment that any reasonable person would find offensive.

131.    As a consequence of the foregoing misconduct by NASCAR, the Charter Defendants, and ISC, Diversity Motorsports has incurred significant economic loss, and has sustained lasting and permanent damage.

132.    As a result of the actions of NASCAR, the Corporate Defendants, and ISC, Diversity Motorsports was prevented from recognizing the profits earned by motorsports racing teams from driver earnings, sponsorship, NASCAR's points-based pro-rata share of TV revenues, gate revenues and merchandising.

133.    Accordingly, Diversity Motorsports is entitled to Seventy-Five Million Dollars ($75,000,000.00) in compensatory and Four Hundred Twenty-Five Million Dollars ($425,000,000.00) in punitive damages, as well as equitable relief, plus the costs and disbursements of this action including reasonable attorneys' fees.

## AS AND FOR A THIRD CAUSE OF ACTION
## NYSHRL – RACE DISCRIMINATION (COX)

134.    Cox and Diversity Motorsports repeat and realleges each and every allegation contained in paragraphs 1 through 126 inclusive, with the same force and effect as though more fully set forth at length herein.

135.     Because he is African-American, NASCAR, the Charter Defendants, and ISC have denied Cox the same rights to make and enforce contracts enjoyed by Caucasian citizens employed by and/or associated with NASCAR, including rights involving the making, performance, modification, and termination of employment and marketing contracts with NASCAR, as well as the enjoyment of all benefits, privileges, terms and conditions of such relationships, as provided under New York State Human Rights Law – Executive Law Section 290 et seq.

136.     Because he is African American, Cox has been deprived of the right to be employed by NASCAR, the Charter Defendants, and ISC and has further been deprived of the right to contract with NASCAR, the Charter Defendants, and ISC.

137.     Because he is African American, Cox has been subjected to virulently hostile and discriminatory treatment that any reasonable person would find offensive.

138.     As a consequence of the NASCAR, the Charter Defendants, and ISC's intentional and wrongful conduct, Cox has incurred physical and psychological trauma and injury, has suffered great humiliation, loss of esteem, mental anguish, distress, shock, fright and suffering, has incurred significant economic loss, and has sustained lasting and permanent damage.

139.     As a result of the actions of NASCAR, the Corporate Defendants, and ISC, Cox was prevented from recognizing the profits earned by motorsports racing teams from driver earnings, sponsorship, NASCAR's points-based pro-rata share of TV revenues, gate revenues and merchandising.

140.     Accordingly, Cox is entitled to Seventy-Five Million Dollars ($75,000,000.00) in compensatory and Four Hundred Twenty-Five Million Dollars ($425,000,000.00) in punitive damages, as well as equitable relief, plus the costs and disbursements of this action including reasonable attorneys' fees.

## AS AND FOR A FOURTH CAUSE OF ACTION
### §1981- RACE DISCRIMINATION (DIVERSITY MOTORSPORTS)

141.   Cox and Diversity Motorsports repeat and realleges each and every allegation contained in paragraphs 1 through 126 inclusive, with the same force and effect as though more fully set forth at length herein.

142.   Because Diversity Motorsports is an African-American owned business, NASCAR, the Charter Defendants, and ISC have denied Diversity Motorsports the same rights to make and enforce contracts enjoyed by White-owned businesses contracting with and/or associated with Defendant, including rights involving the making, performance, modification, and termination of employment and marketing contracts with Defendant, as well as the enjoyment of all benefits, privileges, terms and conditions of such relationships, as provided under New York State Human Rights Law – Executive Law Section 290 et seq.

143.   Because Diversity Motorsports is an African-American owned business, NASCAR, the Charter Defendants, and ISC have refused to contract with Diversity Motorsports, deprived Diversity Motorsports of the right to contract with NASCAR, the Charter Defendants, and ISC have, and has further subjected the company to virulently hostile and discriminatory treatment that any reasonable person would find offensive.

144.   As a consequence of the foregoing misconduct by NASCAR, the Charter Defendants, and ISC, Diversity Motorsports has incurred significant economic loss, and has sustained lasting and permanent damage.

145.    In the employment and contracting practices described above, NASCAR, the Charter Defendants, and ISC have intentionally engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of Diversity Motorsports, entitling Diversity Motorsports to punitive damages.

146.    As a result of the actions of NASCAR, the Corporate Defendants, and ISC, Cox was prevented from recognizing the profits earned by motorsports racing teams from driver earnings, sponsorship, NASCAR's points-based pro-rata share of TV revenues, gate revenues and merchandising.

147.    Accordingly, Diversity Motorsports is entitled to Seventy-Five Million Dollars ($75,000,000.00) in compensatory and Four Hundred Twenty-Five Million Dollars ($425,000,000.00) in punitive damages, as well as equitable relief, plus the costs and disbursements of this action including reasonable attorneys' fees.

**WHEREFORE,** Cox and Diversity Motorsports demand judgment against NASCAR, the Charter Defendants, and ISC;

(i)    On the First Cause of Action in the amount of Seventy-Five Million Dollars ($75,000,000.00) in compensatory and Four Hundred Twenty-Five Million Dollars ($425,000,000.00) in punitive damages.

(ii)    On the Second Cause of Action in the amount of Seventy-Five Million Dollars ($75,000,000.00) in compensatory and Four Hundred Twenty-Five Million Dollars ($425,000,000.00) in punitive damages.;

(iii)    On the Third Cause of Action in the amount of Seventy-Five Million Dollars ($75,000,000.00) in compensatory and Four Hundred Twenty-Five Million Dollars ($425,000,000.00) in punitive damages.;

(iv)    On the Fourth Cause of Action in the amount of Seventy-Five Million Dollars ($75,000,000.00) in compensatory and Four Hundred Twenty-Five Million Dollars ($425,000,000.00)) in punitive damages.;

(v)    For an affirmative injunction requiring NASCAR, the Charter Defendants, and ISC to take such immediate remedial actions as the Court deems necessary to fully integrate the African-American community into their respective organizations;

(vi)    For the costs and disbursements of this action including reasonable attorney's fees; and

(vii)    For such other and further relief as the Court deems just and proper.


Dated:   New York, New York
         September 16, 2016

                                        Law Offices of Ronald I. Paltrowitz



                                        By: _____
                                        Ronald I. Paltrowitz (2746)
                                        405 Lexington Avenue, 26th Floor
                                        New York, New York 10174
                                        Tel.: 917-822-2881
                                        Fax:  203-730-2022
                                        rpal@paltrowitzlaw.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


TERRANCE COX, et al.,


Plaintiff,


-against-


NATIONAL ASSOCIATION FOR STOCK CAR RACING, INC,
        et al,

Defendants.



**COMPLAINT**



Law Offices of Ronald I. Paltrowitz
Attorneys for Plaintiffs
405 Lexington Avenue (26th Floor)
New York, New York 10174
Tel.: (917) 822-2881
Fax:  (203) 730-2022
Email: rpal@paltrowitzlaw.com